UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERROL SANDERS

     Petitioner,

v.                                                                    Case No. 8:09-cv-2509-T-23TGW

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **O R D E R**

     Terrol Sanders petitions for the writ of habeas corpus under 28 U.S.C.

§ 2254 (Doc. 1) and challenges the validity of his state convictions for first-degree

murder, attempted second-degree murder, burglary of a dwelling with a firearm,

attempted robbery with a firearm, and attempted kidnapping with a firearm.

Sanders alleges several grounds of trial court error and ineffective assistance of

both trial counsel and appellate counsel.  Numerous exhibits ("Respondent's

Exhibit __") support the response.  (Doc.  14)

## **FACTS**[1]

     Armed with a gun, Sanders forcibly entered the home of Rick and Linda

Valdez by "kicking-in" the front door.  Sanders found the couple asleep in their

bedroom.  Sanders used an electrical cord from an alarm clock to bind Rick's and

---

[1] This factual summary derives from Sanders's brief on direct appeal and evidence adduced at trial. (Respondent's Exhibits B, C)

Linda's hands.  Rick lunged at Sanders and a struggle ensued.  Linda fled the room

and pushed the panic button on the home burglar alarm.  Hearing gunshots, Linda

ran back toward the bedroom to help Rick and she sustained a non-fatal gunshot

wound to her chest.  Linda discovered Rick collapsed on the floor in the hallway.

Rick sustained five gunshots wounds and died at the scene.

Sanders fled to New Jersey, where he was later arrested in an unrelated

case.  New Jersey law enforcement officers informed the Tampa Police

Department that Sanders was in custody.  Tampa Police Detective Childers flew to

New Jersey to interview Sanders about the Florida crimes.  Sanders confessed to

Detective Childers and returned to Florida to face capital charges.[2]

The trial judge appointed attorneys Gerod Hooper and Jill Menadier to

represent Sanders at his jury trial.  After Hooper's opening statement, in which he

conceded some incriminating facts in an effort to avoid Sanders's receiving a death

sentence, Sanders moved to discharge Hooper.  The trial judge granted the motion.

Menadier represented Sanders during the remainder of the trial.[3]  The jury at the

conclusion of the guilt phase convicted Sanders of first-degree murder, attempted

second-degree murder, burglary of a dwelling with a firearm, two counts of

attempted robbery with a firearm, and attempted kidnapping.  Following the

---

[2]  The jury at the conclusion of the penalty phase recommended life imprisonment.

[3]  Hooper planned to conduct the guilt phase, and Menadier planned to conduct the penalty phase.

penalty phase, the jury recommended a life sentence for the first-degree murder conviction, a sentence the trial judge imposed.[4]

## I.    COGNIZABILITY AND PROCEDURAL DEFAULT

**Ground One**

The week before trial commenced Sanders moved to terminate his appointed counsel (attorneys Hooper and Menadier).  Following several *Nelson*[5] inquiries and a *Faretta*[6] hearing, the trial judge allowed Sanders to represent himself with his discharged counsel remaining as stand-by counsel.  Sanders moved for a lengthy continuance to prepare his defense.  The trial judge denied the continuance.  As a result, Sanders changed his mind about representing himself and the trial judge re-appointed Hooper and Menadier to represent Sanders. Sanders contends that the trial court erred by denying his *pro se* motion for a continuance.

Federal habeas relief for a person in custody pursuant to the judgment of a state court is available only on the ground that the custody violates the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a).  Relying only upon state law, Sanders argued in his direct appeal that the trial court

---

[4] Sanders also serves life imprisonment for each of the second-degree murder, burglary, and attempted kidnapping convictions.  He serves a consecutive thirty-year sentence for each attempted robbery conviction.  (Respondent's Exhibit 1)

[5] *Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973).

[6] *Faretta v. California*, 422 U.S. 806 (1975).

erroneously denied him a continuance.  (Respondent's Exhibit C, Sanders's

appellate brief, pp. 20-21)  Sanders failed to alert the state appellate court of a

federal constitutional claim.  *See Anderson v. Harless*, 459 U.S. 4, 5-6 (1982) ("It is

not enough that all the facts necessary to support the federal claim were before the

state courts or that a somewhat similar state-law claim was made.").  A claim that

a trial judge failed under state law or state procedural rules to grant a continuance

provides no basis for federal habeas corpus relief because the claim presents no

federal constitutional question.[7]  28 U.S.C. § 2254(a).  *See also Swarthout v. Cooke*,

___ U.S. ___, 131 S. Ct. 859, 861, 178 L. Ed. 2d 732 (2011) ("The habeas statute

unambiguously provides that a federal court may issue a writ of habeas corpus to a

state prisoner only on the ground that he is in custody in violation of the

Constitution or laws or treaties of the United States.") (internal quotations and

citations omitted)*; Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the

province of a federal habeas court to re-examine state-court determinations on

state-law questions.").  Consequently, ground one warrants no relief.[8]

**Ground Two**

Sanders contends that the trial judge erred by upwardly departing from the

state sentencing guidelines in fashioning Sanders's sentence.  A ground alleging a

---

[7]  Sanders asserts no federal constitutional claim in either his direct appeal or his federal petition based on the trial court's denial of the continuance.

[8]  Alternatively, to the extent that ground one, liberally construed, asserts a federal due process claim, the ground warrants no relief because Sanders failed to exhaust the ground in the state court on direct appeal.

failure to follow a state sentencing procedure presents no basis for federal habeas corpus relief because the claim presents no federal constitutional question. 28 U.S.C. § 2254(a). *See also Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) ("In the area of state sentencing guidelines in particular, [the Eleventh Circuit has] consistently . . . held that federal courts cannot review a state's alleged failure to adhere to its own sentencing procedures."). Consequently, ground two warrants no relief.

**Ground Four**

During the trial the prosecutor questioned a police officer about a gun the officer recovered from Sanders's grandmother's house. Sanders contends that his trial counsel rendered ineffective assistance by not moving to suppress the gun. Sanders claims that, "[b]ecause the gun (1) was not shown to have fired the bullets recovered from the victims, (2) was in poor condition, and (3) fired [only] intermittently, if at all, counsel should have filed a motion to suppress the firearm." (Doc. 1, pp. 27-28)

The state post-conviction court rejected this ground (Respondent's Exhibit I, pp. 2-3) (court's record citations omitted):

> Defendant alleges ineffective assistance of counsel for failing to argue for the suppression of the firearm before its being introduced as evidence during the trial. Defendant contends that had counsel argued before trial that, because of where the gun was found, the condition of the gun once it was found, its firing history, and the fact that the gun recovered was not the gun used in the crime, Defendant would not have been further prejudiced by the jury hearing counsel['s] objections to the admission of this firearm

during the course of the trial.  However, "allegations of ineffective assistance of counsel cannot be used to circumvent the rule that post-conviction proceedings cannot serve as a second appeal." *Thompson v. State*, 759 So. 2d 650, 653 (Fla. 2000) [()citing *Teffeteller v. State*, 734 So. 2d 1009, 1023 (Fla. 1999)[)].  On direct appeal, Defendant raised the issue that the court erred in allowing the introduction of an exhibit, the firearm, where the firearm was not sufficiently shown to have any relevance to any disputed fact in the case.  In his argument on direct appeal, Defendant argued precisely the same reasoning that he now alleges as ineffective assistance of counsel for failing to file a motion to suppress.  Since the allegation was raised and addressed on direct appeal, Defendant is precluded form re-litigating the allegation by couching it as ineffective of [sic] assistance.

Moreover, even assuming *arguendo*, that counsel committed an error by failing to file a motion to suppress, Defendant fails to show how counsel's failure to file such a motion affected the outcome of the proceedings.  A review of the trial transcript reflects that three witnesses testified with regards to the firearm.  Ms. Courter testified that upon discovering a gun in her backyard, she called the Tampa Police Department to retrieve it.  Officer Holloway testified that he collected the firearm, a .22 revolver, from the backyard and put it into evidence.  He was then cross-examined on how a revolver works.  Lastly, Bill Hornsby, a criminal analyst with the Florida Department of Law Enforcement (FDLE) regarding his comparison of the submitted bullets and recovered firearm, concluded that although "they could have been fired from the same revolver," he was unable to get a positive identification.  Therefore, it would have been impossible to suggest that a motion to suppress would have led to a different outcome, as the conclusion of the firearms expert, Mr. Hornsby, failed to state with any degree of certainty one way or another as to whether or not the bullets could or could not have been fired from the submitted firearm.  Defendant fails to meet the second prong of the *Strickland* test and, as such, no relief is warranted on this ground.

The failure of a federal habeas petitioner to adhere to state procedural rules governing the proper presentation of a claim generally bars federal review of that claim in a subsequent federal habeas corpus proceeding. *See Coleman v. Thompson*, 501 U.S. 722 (1991); *Wainwright v. Sykes,* 433 U.S. 72, 97 (1977); *Sims v. Singletary,*

155 F.3d 1297, 1311 (11th Cir. 1998). "However, a state court's rejection of a

federal constitutional claim on procedural grounds will only preclude federal

review if the state procedural ruling rests upon [an] 'independent and adequate'

state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). A state court's

procedural ruling constitutes an independent and adequate state rule of decision if

(1) the last state court rendering a judgment in the case clearly and expressly states

that it is relying on a state procedural rule to resolve the federal claim without

reaching the merits of the claim, (2) the state court's decision rests solidly on state

law grounds and is not intertwined with an interpretation of federal law, and

(3) the state procedural rule is not applied in an "arbitrary or unprecedented

fashion," or in a "manifestly unfair manner." *Judd*, 250 F.3d at 1313.

　　　Sanders litigated the admissibility of the gun on direct appeal.

Consequently, this claim was procedurally barred and not cognizable on collateral

attack. *See Torres-Arboleda v. Dugger*, 636 So. 2d 1321, 1323 (Fla. 1994)

("Proceedings under [R]ule 3.850 are not to be used as a second appeal; nor is it

appropriate to use a different argument to re-litigate the same issue.") (citation

omitted). The state post-conviction court expressly relied upon an independent

and adequate state procedural bar to reject Sanders's ineffective assistance of

counsel claim. The state appellate court affirmed the application of the procedural

bar. (Respondent's Exhibit D6) *See Harmon v. Barton*, 894 F.2d 1268, 1274 (11th

Cir. 1990) (finding that the state appellate court's *per curiam* affirmance of the

lower court's ruling explicitly based on procedural default is a clear and express statement of its reliance on an independent and adequate state law ground barring federal review).  The state post-conviction court's express reliance upon an independent and adequate state procedural bar to reject Sanders's ineffective assistance of counsel claim results in a procedural default.

Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable."  *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).  To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court."  *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999).  *See also Murray v. Carrier*, 477 U.S. 478 (1986).  To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions.  *United States v. Frady*, 456 U.S. 152 (1982).  In other words, he must show at least a reasonable probability of a different outcome.  *Henderson*, 353 F.3d at 892; *Crawford  v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

A petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if review is necessary to correct a

fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 495-96. A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson*, 353 F.3d at 892. This exception requires a petitioner's "actual" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). To meet this standard, a petitioner must show a reasonable likelihood of acquittal absent the constitutional error. *Schlup*, 513 U.S. at 327.

Sanders fails to demonstrate cause and prejudice excusing his default. *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96. He neither alleges nor shows that the fundamental miscarriage of justice exception applies. *Henderson*, 353 F.3d at 892. Because Sanders fails to proffer specific facts showing an exception to procedural default, ground four is procedurally barred from federal review. *See Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir. 1999) ("A state habeas corpus petitioner who fails to raise his federal claims in state court is procedurally barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default.").

## II.    MERITS

Sanders's remaining grounds, claims of ineffective assistance of both trial counsel and appellate counsel asserted in grounds three and five through eight, are exhausted and entitled to review on the merits.

**Standard of Review**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA")

governs Sanders's petition.  *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210

(11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000).  Section 2254(d), which creates a

highly deferential standard for federal court review of a state court adjudication,

states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or
> > involved an unreasonable application of, clearly
> > established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the
> > evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court

interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal
> habeas court to grant a state prisoner's application for a writ of habeas
> corpus with respect to claims adjudicated on the merits in state court.
> Under § 2254(d)(1), the writ may issue only if one of the following two
> conditions is satisfied--the state-court adjudication resulted in a decision
> that (1) "was contrary to . . . clearly established Federal Law, as
> determined by the Supreme Court of the United States" or (2) "involved
> an unreasonable application of . . . clearly established Federal law, as
> determined by the Supreme Court of the United States."  Under the
> "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this
> Court has on a set of materially indistinguishable facts.  Under the

"unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 786-87 (2011). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 694. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess

the reasonable decisions of state courts." *Renico v. Lett*, ____ U.S. ____, 130 S. Ct. 1855, 1866 (2010).  *See also Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

In a *per curiam* decision without a written opinion the state appellate court on direct appeal affirmed Sanders's convictions and sentences.  (Respondent's Exhibit C) Similarly, in another *per curiam* decision without a written opinion the state appellate court affirmed the denial of Sanders's subsequent Rule 3.850 motion to vacate. (Respondent's Exhibit N)  The state appellate court's *per curiam* affirmances warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due."  *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied*, 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003).  *See also Richter*, 131 S. Ct. at 784-85 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Review of the state court decision is limited to the record that was before the state court.

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication

- 12 -

> that "resulted in" a decision that was contrary to, or "involved" an
> unreasonable application of, established law.  This backward-looking
> language requires an examination of the state-court decision at the time
> it was made.  It follows that the record under review is limited to the
> record in existence at that same time, i.e., the record before the state
> court.

*Pinholster*, 131 S. Ct. at 1398.  Sanders bears the burden of overcoming by clear and

convincing evidence a state court's factual determination.  "[A] determination of a

factual issue made by a State court shall be presumed to be correct.  The applicant shall

have the burden of rebutting the presumption of correctness by clear and convincing

evidence."  28 U.S.C. § 2254(e)(1).  This presumption of correctness applies to a

finding of fact but not to a mixed determination of law and fact.  *Parker v. Head*, 244

F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001).  The state court's rejection

of Sanders's post-conviction claims warrants deference in this case.  (Order Denying

Motion for Post-Conviction Relief, Respondent's Exhibit 8)

### Standard for Ineffective Assistance of Counsel

Sanders claims ineffective assistance of counsel, a difficult claim to sustain.

"[T]he cases in which habeas petitioners can properly prevail on the ground of

ineffective assistance of counsel are few and far between."  *Waters v. Thomas*, 46 F.3d

1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th

Cir. 1994)).  *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective

assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled
> and well documented.  In *Strickland v. Washington*, 466 U.S. 668, 104
> S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a

> two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Sanders must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the

judgment." 466 U.S. at 691-92.  To meet this burden, Sanders must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91.  Sanders cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . .  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious:  the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable . . . .  [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).  *See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (counsel has no duty to raise a frivolous claim).

Sanders must prove that the state court's decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Sustaining a claim of ineffective assistance of counsel is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788. *See also Pinholster*, 131 S. Ct. at 1410 (A petitioner must overcome this "'doubly deferential' standard of *Strickland* and the AEDPA."), and *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011) ("Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.").

**Ground Five**

Before trial Sanders moved to suppress his post-arrest statements to the police. Following a lengthy suppression hearing the trial judge denied the motion.[9] Sanders

---

[9] The written order denying the motion to suppress (Doc. 1, Ex. B-3) states:

> THIS CAUSE having been heard by the court, upon the Defendant's Motion Suppress the Confession, and the court after hearing testimony and argument of counsel, hereby makes the following findings of facts:
>
> 1.   The Defendant never made an unequivocal statement to New Jersey law enforcement officials indicating his desire to terminate interrogation by law enforcement or indicating a

(continued...)

contends that his trial counsel (Hooper) rendered ineffective assistance during the suppression hearing by (1) not providing to the trial court a police report from the New Jersey authorities showing that Sanders unequivocally invoked his right to remain silent, (2) not ensuring that New Jersey Detective Joseph Kolakowski was available to both give a deposition and testify at the suppression hearing, and (3) not arguing appropriate case law to support Sanders's contention that he unequivocally invoked his right to remain silent about the Florida case.

   1. Failing to provide the police report

   Sanders argues that Hooper should have introduced at the suppression hearing Detective Kolakowski's police report.  The state post-conviction court rejected this ground after an evidentiary hearing (Respondent's Exhibit K, pp. 3-6) (court's record citations omitted) (emphasis in original):

---

[9](...continued)

desire to prevent or limit subsequent interrogation by Tampa Police Department detectives; and

2. The Defendant was fully informed of his constitutional rights prior to custodial interrogation; and

3. The Defendant voluntarily waived his constitutional rights prior to custodial interrogation; and

4. The Defendant's confession was not the product or result of law enforcement coercion, threat, intimidation, or physical abuse; and

5. The Defendant never requested the assistance or presence of legal counsel prior to or during any statement made to law enforcement.

[3]a.  [Counsel] failed to support with documentation the fact that
Defendant made an unequivocal statement to New Jersey law
enforcement invoking his right to remain silent.  Defendant contends
that the only evidence the trial court had in this regard was Defendant's
testimony and the testimony of Det[ective] Childers.  Defendant claims
that counsel had a copy of the New Jersey police report that clearly
showed that Defendant did unequivocally invoke his right to remain
silent.

Direct examination of Defendant

3a.  Defendant testified that [counsel] provided ineffective counsel
because he failed to argue that Defendant unequivocally invoked his
Fifth Amendment right to remain silent to the New Jersey police officers
pertaining to the Florida case.  He also stated that he and [trial counsel]
had a number of discussions about filing a motion to suppress
Defendant's statements and he even sent [trial counsel] a letter regarding
his feeling about filing the motion.

[Post-conviction counsel] inquired whether there was any
documentation that Defendant invoked his right to remain silent and
Defendant acknowledged that it was in the New Jersey police report.
He advised that he mailed a copy of that report to [trial counsel] prior to
the suppression hearing.  Defendant stated that he believed the police
report supported his allegation in the motion to suppress.
[Post-conviction counsel] then introduced the New Jersey police
report . . . which was admitted without objection.

Defendant stated that he had underlined a portion of the New Jersey
police report that unconditionally invoked his Fifth Amendment right to
remain silent as to the Florida case.  He also stated that he testified at the
suppression hearing that he had told the New Jersey police officer that
he wanted to invoke his right to remain silent about the Florida case.
[Post-conviction counsel] inquired whether Defendant had advised [trial
counsel] that he had told the detention officer at the Middlesex County
Adult Correctional Facility in New Jersey that he did not wish to talk to
Tampa Police Det[ective] Randy Childers the first time that the
[detective] came to talk to him[.]  Defendant replied, "Yes, ma'am."

Cross-examination of Defendant

3a.  [The assistant state attorney at the Rule 3.850 evidentiary hearing]
asked Defendant if he remembered his allegation "that [trial counsel]
was ineffective because he did not introduce Det[ective] Kolakowski's

police report with specific reference to page three of the police report . . .," and Defendant acknowledged that he did. [The assistant state attorney] read the portion of Det[ective] Kolakowski's police report that pertained to Defendant's desire not to discuss the Florida case and then inquired if that was the portion that Defendant alleged that [trial counsel] failed to mention. Defendant answered, "Yes."

[The assistant state attorney] inquired whether Defendant had reviewed the transcript from the suppression hearing and whether Defendant was present at the hearing. Defendant responded "yes" to each question. Defendant also acknowledged that he had no reason to believe that the transcript was improperly transcribed. [The assistant state attorney] then introduced the suppression hearing transcript . . . which was a cumulative exhibit comprised of the transcripts from March 30, 1998, and March 31, 1998, which were admitted into evidence without objection. [The assistant state attorney] referred to . . . the March 30th transcript and asked Defendant if he recalled [the assistant state attorney] asking Det[ective] Kolakowski if he had spoken with Mr. Sanders about talking to him about the Florida murder and Det[ective] Kolakowski answered that he did. [The assistant state attorney] asked Detective Kolakowski to explain further. Det[ective] Kolakowski testified[:]

> I spoke to Mr. Sanders and I asked him if he was aware that there were charges pending on him and he said, yes, there were. Mr. Sanders stated that he would talk to us and be truthful and honest about any incident that occurred in New Jersey but he would prefer not to discuss the Florida incident because he would have to - - he's concerned about his defense, what would happen with his defense. He would have to figure out how he was going to defend himself against those charges.

[The assistant state attorney] stated, "That testimony was brought out by the prosecution in the motion to suppress, wasn't it[?]" Defendant responded, "Yes, sir." [The assistant state attorney] then referred to page 21 of the March 30th transcript where [trial counsel] on cross-examination of the detective asked, "And is it fair to say that [the Defendant] indicated to you that he did not want to speak about the Florida incident?," and the detective answered, "Yes." Finally, [the assistant state attorney] inquired, "[Trial counsel] got the detective to concede exactly what was in the written police report that you told Detective Kolakowski that you didn't want to talk to him about the Florida incident?" Defendant responded, "Yes."

> Therefore, Judge Mitcham heard from both the state and the defense that Defendant did not want to discuss the Florida incident with the New Jersey detective.
>
> Court's findings of [sic] 3a
>
> After reviewing the New Jersey police report, the suppression hearing transcripts, and the post-convcition transcript, this court finds that Defendant has failed to prove that [trial counsel]'s performance either constituted a substantial and serious deficiency measurably below that of competent counsel or prejudiced Defendant to the extent that there is likelihood that the deficient conduct affected the outcome of the proceedings.  As such, Defendant is not entitled to any relief on this ground.

Detective Kolakowski testified at the pre-trial suppression hearing that he advised Sanders of his constitutional rights before interviewing him.  Sanders agreed to both waive his rights and speak with Detective Kolakowski about the New Jersey charges.  (Respondent's Exhibit O2, pp. 8-12)  Detective Kolakowski asked Sanders a few questions about the Florida charges and Sanders "stated that he would prefer not to discuss the Florida incident because he would have to - - he's concerned about his defense, what would happen with his defense.  He would have to figure out how he was going to defend himself against those charges."  (Respondent's Exhibit O2, p. 14)  Detective Kolakowski testified that Sanders clearly stated that he did not want to talk about the Florida charges with the New Jersey officers.  (Respondent's Exhibit O1, pp. 21-22)  Although Sanders did not want to speak about the Florida charges, he did not request counsel or ask to terminate the police interview but continued discussing the New Jersey charges with the New Jersey officers.

Detective Childers of the Tampa Police Department testified at the suppression hearing that Detective Kolakowski advised him that Sanders was in custody but did not want to speak to the New Jersey authorities about the Florida crimes. Detective Childers traveled to New Jersey to interview Sanders. Detective Childers advised Sanders of his constitutional rights and Sanders both orally stated that he understood his rights and signed a written "consent to be interviewed" form. (Respondent's Exhibit O1, pp. 1526-29) Sanders agreed to speak to Detective Childers without counsel. After initially speaking with Sanders about the Florida crimes, Detective Childers asked Sanders to give a tape-recorded statement. Sanders advised that he would do so only after he got an attorney. Detective Childers concluded the interview.

Sanders argues that Hooper should have introduced at the suppression hearing a copy of Kolakowski's police report which shows that he unequivocally invoked his right to remain silent. Specifically, Sanders relies upon the following excerpt of the report (Doc. 1, Ex. B4, p. 3):

> Sanders was asked if he was in Florida at the time of the murder, attempted murder, home invasion robbery, and armed burglary. Sanders stated that, no, he was not. At this time Terrol Sanders stated that he no longer wished to speak about anything in regards to the Florida incident. Sanders stated that he would speak about any crimes that he committed in New Jersey but that he no longer wished to speak about Florida. Sanders continued to state that these were real serious charges and that he did not wish to implicate himself in the Florida incident. Sanders also stated that he would answer all of the questions honestly in regards to the incidents in New Jersey but that he has to think about a defense in regards to the Florida charges before he would say anything about it.

Hooper elicited from Detective Kolakowski at the suppression hearing the same information contained in the police report.  Sanders at the Rule 3.850 evidentiary hearing admitted that Hooper elicited this information at the suppression hearing.[10] Consequently, Sanders fails to show how Hooper's decision not to introduce the police report affected the outcome of the suppression hearing.[11]  Sanders demonstrates neither

---

[10]  Sanders testified on cross-examination (Respondent's Exhibit J, pp. 34-35):

Q:   [Counsel] got the detective to concede exactly what was in the written police report that you told Detective Kolakowski that you didn't want to talk to him about the Florida incident?

A:   Yes.

Q:   In fact, the written document doesn't add anything to the issue that was before [the trial judge] because that testimony was brought out during the motion to suppress?

A:   It would have supported it.

Q:   But the fact of the matter was that fact of what you told Detective Kolakowski about not wanting to talk about the Florida charges was brought out in the motion to suppress first by the prosecutor and then by [trial counsel] on cross-examination; is that right?

A:   Yes.

. . . .

Q:   That very testimony, the fact of what you told Detective Kolakowski was before [the trial judge] at the motion to suppress, was it not?

A:   Yes, sir.

[11]  Counsel testified at the Rule 3.850 hearing (Respondent's Exhibit J, pp. 47-48) that the report did not add anything to Detective Kolakowski's testimony:

Q:   On the issue of the allegation of ineffective assistance of counsel for failing to introduce Detective Kolakowski's supplement as corroboration that [Sanders] unequivocally invoked his right to remain silent as far as the Florida charges were concerned, did you elicit the same substance from Detective Kolakowski in the motion to suppress that was contained in the report?

(continued...)

deficient performance nor resulting prejudice as *Strickland* requires.   Sanders fails to

show that the state court's rejection of this ground is either an unreasonable application

of Supreme Court precedent or an unreasonable determination of the facts.

    2.   <u>Failing to ensure Detective Kolakowski's availability</u>

    Sanders contends that Hooper rendered ineffective assistance by not ensuring

that Detective Kolakowski was available to both give a pre-trial deposition and testify

at the suppression hearing.   The state post-conviction court rejected this ground after

an evidentiary hearing (Respondent's Exhibit K at 7-8) (emphasis in original):

> 3b.   [Trial counsel] was ineffective for failing to present Detective
> Kolakowski's testimony or his deposition, provided that one was taken.

---

[11](...continued)

    A:      Yes.

    Q:      And in your professional view did the police report, the substance that I read
            into the record moments ago within that police report, add anything to
            Detective Kolakowski's testimony that was not presented during the motion
            to suppress either by yourself or by the State?

    A:      No.   Verbal testimony is the sworn testimony.

    Q:      Did you find any inconsistency in the substance of Detective Kolakowski's
            police report to what he testified in the motion to suppress?

    A:      No.

    Q:      As your understanding of Florida evidentiary law, would the actual police
            report in view of the fact that there were no inconsistencies with the sworn
            statement elicited in the police report, would the police report [have] been
            admitted?

    A:      No.   Again, it was an unsworn statement.

Direct examination of Defendant

3b. [Post-conviction counsel] inquired whether Defendant had alleged that New Jersey Detective Kolakowski did not testify at the suppression hearing and Defendant stated that he had.  Then she asked whether he had since gotten a copy of the March 30, 1998, suppression hearing transcript that showed Detective Kolakowski did, in fact, testify and he stated that he had.

Cross-examination of Defendant

On cross-examination [the assistant state attorney] asked Defendant if when he signed the oath, he was saying that the allegations in his motion were true.  Defendant replied that the allegations were true "to the best of his knowledge."  [The assistant state attorney] asked Defendant whether he was present when Detective (Det.) Kolakowski testified at the suppression hearing and he advised that he was.  [The assistant state attorney] stated that if Det. Kolakowski was present and testified, then Defendant's <u>allegation was contrary to the sworn claim</u>.  Defendant stated that he had <u>forgotten</u> that Det. Kolakowski had testified.  [The assistant state attorney] asked, "So are you saying that Detective Kolakowski did testify?"  Defendant answered, "Yes, he did."  [The assistant state attorney] responded, "You would acknowledge that's a mistake and shouldn't be argued before this court, right?"  Defendant's answer, "Yes, sir."

Court's finding of [sic] 3b.

The court finds that Defendant has failed to prove either prong of the *Strickland* test because Det. Kolakowski, in fact, testified at the suppression hearing on March 30, 1998; therefore, no relief is granted on this ground.

Contrary to Sanders's contention, the record shows that Detective Kolakowski testified at the suppression hearing.  (Respondent's Exhibit O2, pp. 5-27)  Sanders cannot show that the state court either unreasonably applied Supreme Court precedent or an unreasonably determined the facts in rejecting this claim.

3. <u>Failing to argue appropriate case law</u>

At the conclusion of the pre-trial suppression hearing Hooper cited three state cases[12] to support the motion to suppress Sanders's statements to the police. Sanders argues that Hooper should have instead cited federal cases to support his contention that Sanders unequivocally invoked his right to remain silent when he refused to speak to the New Jersey police about the Florida case. The state post-conviction court rejected this ground after an evidentiary hearing (Respondent's Exhibit K at 8-9):

> 3c. [Trial counsel] was ineffective for presenting and arguing case law that, while closely related to what he was arguing, failed to cover all the points of law needed to obtain the granting of the motion to suppress
>
> <u>Direct examination of Defendant</u>
>
> 3c. [Post-conviction counsel] asked Defendant if he also alleged "that [trial counsel] did not argue the appropriate case law . . . ?" Defendant responded that he did and that [trial counsel] "told the judge he wasn't sure what law applied, either Florida or New Jersey."
>
> She then asked Defendant what he believed that [trial counsel] should have argued and Defendant stated that "the federal law preceded both of them. What I have read, the Florida case law and the New Jersey case law, both of them refer to the federal statutes."

---

[12] Trial counsel argued at the conclusion of the Rule 3.850 evidentiary hearing (Respondent's Exhibit O3, p. 11):

> Troclor, 593 Southern 2nd, 953. State of Florida versus Sapp, S-A-P-P, 690 Southern 2nd, 581. And a New Jersey case, 599 at Lacktan Reporter second series, that's the case of Mujahid, M-U-J-A-H-I-D. That's out of the superior court of New Jersey. That clearly holds that custodial interrogation must cease if [a defendant] desire[s] to assert constitutional rights to remain silent and on down are asserted. And that's where the accused asserted rights to counsel. All interrogation must cease. I submit that the New Jersey standard adheres. That all his statements should be suppressed, Your Honor.

<u>Cross-examination of Defendant</u>

3c.  [The assistant state attorney] inquired whether Defendant alleged that [trial counsel] should have argued federal law which superseded state law and Defendant replied, "Yes, sir."  When asked to tell the court what federal statute or law supersedes Florida law that [trial counsel ] should have argued to this court, Defendant testified that he did not have it with him.  [The assistant state attorney] persisted and [post-conviction counsel] asked the court if she could give Defendant his motion.  Defendant states, "All the case law is right in the motion."

In her closing statement [post-conviction counsel] informed the court that Defendant had cited the following United States Supreme Court cases in his motion:  *Minute v. Mississippi*, *Rhode Island v. Innis*, and *Edwards v. Arizona*.  Defendant testified earlier that he felt [trial counsel] should have argued these cases rather than New Jersey or Florida law.

<u>Court's finding of [sic] 3c.</u>

The court finds that [trial counsel] provided the court with two Florida cases and one New Jersey case.  Unfortunately, the cases are not in the court file; however, what Defendant fails to understand is that the Florida and New Jersey cases may have been based on the same federal cases that he cited.  An attorney of [trial counsel]'s experience would provide the court with the most relevant case law.  As such, Defendant has failed to prove prong one of the *Strickland* test by showing that [trial counsel] provided a deficient performance that was measurably below that of a competent counsel; therefore, Defendant is not entitled to any relief on this ground.

The state cases Hooper cited at the suppression hearing address both the denial of a motion to suppress and the invocation of a defendant's right to counsel and a defendant's right to remain silent.  As the state post-conviction court opined, the state cases rely upon federal law, including *Miranda v. Arizona*, 384 U.S. 436 (1966), *Michigan v. Mosley*, 423 U.S. 96 (1975), *Rhode Island v. Innis*, 446 U.S. 291 (1980), and *Edwards v. Arizona*, 451 U.S. 477 (1981), some of the same cases that Sanders argues Hooper should have presented to the trial court.

Sanders does not demonstrate that the trial judge would have granted the

motion to suppress if Hooper had cited federal cases (rather than state cases that relied

upon the federal cases) to support the motion.  Sanders fails to meet his burden of

proving that the state court unreasonably applied controlling Supreme Court precedent

or unreasonably determined the facts in rejecting this ground.

**Ground Seven**

Sanders contends that Hooper rendered ineffective assistance during opening

statement by conceding Sanders's guilt without Sanders's permission.  Hooper gave the

following opening statement (Respondent's Exhibit B, Vol. VII, pp. 761-63):

> September 19, 1996, in the early morning hours, a frightened young man
> named Terrol Sanders fled his house.  He was high on booze and crack
> to a point where he wasn't functioning normally.  He left a little house
> on Sister Street, made a right, passed a couple of more modest homes,
> made a left on Orleans Street and right before he got to Waters, ran
> in - - ran into the home of two people.
>
> All good?  All bad?  No.  He ran into the home of people and we have a
> bad mixture, folks.  These two people who were sleeping in the house
> also had taken illegal drugs and alcohol within 12 hours of the incident
> before going to bed.  We've got a gray situation here.  We have a
> frightened young man on drugs.  We have a gun.  We have two people
> laying in bed.  They're on drugs.
>
> You're going to have to really, really look at the facts and the evidence
> as it comes from the witness stand.  I'm going to tell you what the
> evidence is and who the witnesses are.  I'm just going to tell you a few
> key points to look out for.  You're going to hear that he went up to their
> door.  And as the prosecutor says, you're going to hear he kicked in the
> door.
>
> He didn't come up there and, you know, like, disconnect the burglar
> alarm and go sneaking in nice and quiet.  No.  He's going to do exactly
> what someone out of their mind would do, kick the door open and
> knock it open.  He goes inside and walks in their house.  People hear

him and they say, ["H]ey, who's that?["]  Turn the light on.  And what
does he do?

Is this someone who's a clever burglar who goes in to steal
something[?]  He clicks the light on or tries to click the light on.  What
happens then is going to be very, very tricky and very detailed.  You
have to listen very closely to some expert testimony here.  Because there
is an exchange of shots.  Mr. Valdez does, for whatever reason, come up
at Terrol Sanders.

And you're going to hear about five shots.  But you're not going to hear
about five shots closely placed in time or vicinity indicative of a design
to kill.  You're going to hear about shots being fired at various parts of
the body and Mr. Sanders turning and running trying to escape, other
shots being fired.  And everything is going to point to him shooting
merely to get out without any intent to kill.

Everything is going to point to, in fact, the opposite direction, folks.
Listen very carefully to the evidence.  And when you come back, I'm
sure you'll render a correct decision.  You will decide exactly what took
place that night.  Thank you.

Based on the opening statement, Sanders, *pro se*, moved on the second day of

trial to disqualify the jury.  (Doc. 1, Ex. B8; Respondent's Exhibits B, Vol. IX, pp.

862-68)  The trial judge denied the motion.  Sanders, *pro se*, moved on the third day of

trial to discharge Hooper.  After an *ex parte in camera* hearing, the trial judge granted

the motion.  (Respondent's Exhibit B, Vol. VIII, pp. 1017-37)[13]  Menadier represented

Sanders for the remainder of the trial.

Sanders argues that Hooper's statements that Sanders both "kicked-in" the front

door of the Valdez home and fired gunshots relieved the prosecution of its burden to

---

[13]  The trial judge directed the clerk to seal the transcript of the *ex parte in camera* hearing.
(Respondent's Exhibit B, Vol. VIII, pp. 1016, 1031)  However, the entirety of the hearing is included
in the trial transcript.

prove both that Sanders was at the crime scene and that Sanders fired the shots that killed one victim and injured the other victim.  The state post-conviction court denied this ground after an evidentiary hearing (Respondent's Exhibit K, pp. 14-24) (court's record citations omitted) (emphasis in original):

<u>Direct examination of Defendant</u>

Defendant alleged that Mr. Hooper was ineffective counsel because he conceded Defendant's guilt in his opening statement after Defendant had unconditionally told him that Defendant did not want to ever concede his guilt because he did not want to relieve the State of the burden of proof that Defendant was at the crime scene where one victim was killed and a second victim was wounded.  Defendant testified that Mr. Hooper stated that Defendant kicked in the door, that shots were exchanged, and that Mr. Valdez was killed.  When asked why he objected to those statements, Defendant stated that he had pled not guilty and he did not want Mr. Hooper to incriminate him in any way.

Defendant further testified that two days after the opening statement, he gave the judge a written motion to dismiss Mr. Hooper as his attorney because Mr. Hooper had conceded his guilt to the jury.  The judge conducted a motion hearing in his chambers.  At that point in the post-conviction hearing, [post-conviction counsel] introduced Defense Exhibit No. 2, the transcript of the motion hearing, which was admitted into evidence without objection.  [The prosecutor] clarified that it was an *in camera* hearing *ex parte* with the judge, Defendant, and defense counsel, but no member of the State was present.  [Post-conviction counsel] stated that the hearing was *ex parte* because Defendant was trying to discharge his trial counsel since counsel had conceded Defendant's guilt.  [Post-conviction counsel] asked Defendant whether he had asked for a mistrial during the *in camera* hearing, and Defendant acknowledged that he had, but the judge had denied the request.

Defendant also testified that Mr. Hooper had never discussed his opening statement with Defendant; however, Defendant asserted that he had repeatedly told Mr. Hooper not to concede his guilt.  Defendant acknowledged that Mr. Hooper had discussed with him several times about using "some kind of dual defense."  Mr. Hooper explained that the dual defense could help if Defendant was found guilty in the first phase, there would be an excuse the defense could use in the penalty phase about why Defendant was in the house, but Defendant stated he

was not happy that Mr. Hooper would have to concede his guilt, and he testified that he repeatedly objected to that.

. . . .

Cross-examination of Defendant

[The prosecutor] inquired whether Defendant had discussions with Mr. Hooper prior to trial regarding Mr. Hooper's opening statement strategy, and Defendant acknowledged that they had on several prior occasions. Defendant testified that he did not get along with Mr. Hooper for several months before trial, that he had represented himself for a period of time, and that he ultimately took Mr. Hooper and Ms. Menadier back as his counsel. [The prosecutor] inquired whether it was Defendant's testimony that despite the discussions about Mr. Hooper's strategy that Defendant unequivocally told Mr. Hooper that he did not want Mr. Hooper to concede Defendant's guilt and Defendant answered, "Yes, sir." [The prosecutor] had no further questions.

[Post-conviction counsel] had no questions on re-direct.

Direct examination of Mr. Hooper

[The prosecutor] asked Mr. Hooper about conceding Defendant's guilt in his opening statement. Mr. Hooper testified, "Obviously I did not concede guilt in the opening. Had I completed the trial my closing and the evidence presented would have had [sic] floated into that and I would have asked for a not guilty verdict." [The prosecutor] asked Mr. Hooper to explain what his goal was in opening statement and how he presented it. Mr. Hooper testified[:]

> Yes. It was Mr. Sanders's desire to, if at all possible, reach a not guilty [verdict] as opposed to a lesser or an integrated defense. We spent a lot of time discussing that. We discussed his fingerprints found on the clock. He was hard to relate to. We didn't have an excellent client attorney relationship to the point where my co-counsel actually retained a defense expert to analyze the prints so we were able to show Mr. Sanders that this is not a police conspiracy. Our defense expert confirmed that his fingerprints were on the clock.

[The prosecutor] inquired whether Defendant had any innocent explanation for his fingerprints on the clock and Mr. Hooper replied,

"No." [The prosecutor] asked Mr. Hooper to proceed with his opening statement strategy[:]

> I explained to Mr. Sanders the only thing the jury saw was your fingerprint on the clock and the only version they got was the version of the surviving victim that it would be clearly felony murder, clearly first-degree murder. Not even a remote chance of a not guilty or a lesser. The best way to proceed where you could have asked for a not guilty but it would be a very, very remote shot, but at least it would not shut the door to a lesser would be to concede facts, not concede guilt, but concede facts. In other words, they had the prints on the clock to negate [sic] premeditated murder. I was able to do that through bullet angles and forensics.

> To negate felony murder it would require explaining how he went into their home [with] other than illegal intentions. I explained to him the only way we can do that is we would show, and this would have been followed up with the evidence and highlighted in my closing, that he did not enter a dwelling to commit a crime which would lead to felony murder. That he had a confrontation with his family. He was high on crack. He had been drinking and the confrontation with his family was an extremely violent confrontation. He fled from his house which was only a block or two away with the family chasing him. His acts in the house[14] were such that had they caught him they may have killed him or they would have beaten him severely.

[The prosecutor] asked if Defendant was "kicked out of his sister's house that night [because of] sexually inappropriate conduct with a child in the house," and Mr. Hooper stated, "That's correct." [The prosecutor] acknowledged that Defendant's family's allegations had presented Mr. Hooper with strategic difficulties in his defense of Defendant. [The prosecutor] asked Mr. Hooper to explain to the court how he had to handle that problem. Mr. Hooper testified[:]

> I didn't say the reasons, just that he had fled the house. I was going to present circumstances either by his testifying or whether if he didn't want to testify I would try to do it if

---

14 Sanders's family allegedly chased him from their home because he had molested a minor child.

I could without him testifying by eliciting statements from
the police as in the police report relative to his statement.
I believe I had some discussion with [the prosecutor]
relative to the relevance of that and I can't remember
whether we made an agreement between myself and [the
prosecutor] that the nature of why he fled was not
relevant.  I actually had to file a motion *in limine*.  That
was addressed.  The jury would just hear that there was a
violent fight.  He fled in fear of his life.  That's why he ran
into the house.  I mentioned in my opening kicking the
door open which supports the theory of, ["]I am being
chased.  I am in danger.  I will just run and kick a door
open to make a lot of noise,["] which would support my
argument which would go against the prosecution
argument that he snuck into the house for the purpose of
committing a crime.

Mr. Hooper further testified that he was hoping to show that Defendant
was trying to avoid danger himself, and that he was not guilty of any
underlying felony because he had no intent to commit a crime, "or even
if it was a misdemeanor trespass it was not a felony murder situation."
Mr. Hooper continued, " . . . You could get it down to a manslaughter.
We were still going for not guilty so to that scenario I mentioned in my
opening the fact that the victim[s] w[ere] under the influence of illegal
drugs and may have had some degree of culpability in how they
responded to seeing him in the house."

[The prosecutor] inquired whether Mr. Hooper discussed with
Defendant how he intended to present the opening statement and Mr.
Hooper replied, "Yes.  I would have to concede certain facts to explain
how he got into the house."  [The prosecutor] asked, "On any occasion
did Mr. Sanders ever tell you that he did not want you to present an
opening statement along the lines that you ultimately did?"  Mr. Hooper
replied, "No."  [The prosecutor] inquired, "Did he ever show any sign of
reluctance for your strategy of presenting an integrated defense as you
have described in your opening statement?"  Mr. Hooper stated, "No."

Cross-examination of Mr. Hooper

[Post-conviction counsel] summarized a part of Mr. Hooper's opening
statement to which he had already testified as, "[Y]ou did say that Mr.
Sanders kicked in the door and entered the house and was shooting
merely to get out without any intent to kill. Is that correct?"  Mr. Hooper
replied that it was something like that.  Mr. Hooper stated that he had

numerous discussions with Defendant and he had explained to Defendant that "[t]he fingerprints put him in the house.  Without an explanation about that it would have been an open and shut case."

Mr. Hooper further testified that he had discussed the theory of the defense, "[p]robably not the exact words.  Afterward he seemed to be surprised that I said what I said and I was absolutely shocked that he was upset about what I  said.  Obviously there was a miscommunication somewhere along the line."

Mr. Hooper stated that initially Defendant stated that he wanted the State to have to prove that he was guilty without [Hooper] helping them in any way.  "It was difficult to explain things to him.  Even [for the] [finger]prints we had to get our own expert before he understood his fingerprints were on the clock.  At the time that I made the opening I had reached a comfort level that he understood the way we were going.  I explained to him the theory of defense and I told him I was going to have to explain how he got into the house, *et cetera*, *et cetera*."

[Post-conviction counsel] asked if Mr. Hooper thought "that Mr. Sanders understood an integrated defense or lesser included crimes or felony murder?"  Mr. Hooper replied that he probably "understood as well as a layman could . . . ."  [Post-conviction counsel] inquired, "When you explained to him what you had in mind did he say to you well, that's okay go ahead and do that or did he say I don't understand or did he say nothing?"  Mr. Hooper responded, "No.  He didn't say I don't understand.  I explained to him where I would have to go.  The only possible way of proceeding given the nature of the prints.  I explained that to him.  In the finality before the opening he acquiesced.  It was either [sic] a nod of the head."

[Post-conviction counsel] inquired, "Do you remember telling the judge in chambers that you had to make a judgment call[2] regarding the opening statement?"  Mr. Hooper replied, "Yes. It was a judgment call." When asked what he meant by making a judgment call, Mr. Hooper answered, "A judgment call would be having to say that he was at the scene and explaining it.  It was a judgment call that I previously explained to Mr. Sanders."

> [2] During the *in camera* hearing, Mr. Hooper stated to Judge Mitcham, "I discussed the concept of an integrated defense [and] that is sometimes used in the guilt phase of the trial to set up a  favorable atmosphere for the possibility of just letting the state prove up their case and

- 33 -

taking that approach.  Two things sort of negated that. One is that I lost my motion to suppress the confession so I knew Mr. Sanders'[s] statements to Detective Childers [were] coming in.  And the other thing was the fingerprints on the clock."  The defense counsels even retained their own fingerprint expert, but that did not help their case.  "So faced with the fingerprints and the confession, the best defense would be explaining - - explaining his actions."

"When I gave my opening, Judge, I had a judgment call I had to make.  And it's my opinion . . . then and . . . now . . . to get up there in my opening to the jury and argue that Terrol Sanders did not intend to kill anybody, that he was high on crack."  And I believe one hundred percent that if I would have got[ten] up there and started arguing, well, someone went into the house, but we don't know who and whoever went into the house was high on crack and whoever went into the house was scared, I think I would have completely diluted my opening . . . . I would have just lost all credibility with the jury to know [sic] vantage [sic] whatsoever.  And that's why I made the decision to open the way I opened.  He knows that's been my posture all along.  We discussed that hundreds of times."

The court denied Defendant's motion to discharge the jury panel and refused to grant a mistrial.  The court did dismiss Mr. Hooper as Defendant's counsel.

[Post-conviction counsel] asked, "Mr. Sanders was quite upset after the opening, correct?"  Mr. Hooper replied, "Yes."

[Post-conviction counsel] asked Mr. Hooper if he felt that he "had the right to make a judgment call that conceded Mr. Sander[s]'s guilt."  Mr. Hooper responded, "Well, first of all, I didn't concede his guilt.  I conceded certain facts, admittedly facts that could be incriminating.  I had the right to do [that] after consulting with him and telling him what I was going to do and I did."

Court's findings of [sic] 6

The court finds that Det[ective] Rick Childers, now deceased, testified at trial that he met with Defendant in the Middlesex County Adult

- 34 -

Correctional Facility in New Jersey on October 24, 1996, and that
Defendant **confessed** to the offense.  Det[ective] Childers advised
Defendant of his rights and had Defendant sign Tampa Police
Department's multi-purpose form.  The form was a consent to be
interviewed form, and both Det[ective] Childers and Defendant signed
it.  Det[ective] Childers got Defendant to verbally acknowledge that he
heard and understood his *Miranda*[3] rights.  There also was a second form
which was a consent form from New Jersey, also signed by Det[ective]
Childers and Defendant.

> [3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16
> L. Ed. 2d 694 (1966).

The prosecutor asked Det[ective] Childers if he taped his interview with
Defendant, and Det[ective] Childers said that Defendant did not want
him to tape the interview.  Defendant started talking to Det[ective]
Childers about what happened that night:

> [H]e said his sister got mad at him and he was thrown out
> of his house.  He remembered by 11:00 that night in the
> early morning hours smoking about a hundred dollars
> worth of crack cocaine, drinking a half a fifth of Tequila
> and a six pack of beer.  And I asked him what kind of beer
> and he couldn't recall.

> And he remembered just going out of the house and
> staggering around.  He doesn't remember anything.  I
> asked him about a gun and he didn't know anything about
> a gun.  At that point then Mr. Sanders wanted to talk
> about his girlfriend, Rebecca Hill, and then I started
> talking to him basically about his own personal life when
> he was growing up.  That's when he made note that he
> thought maybe I was recording this conversation.

> And I opened my brief case and showed him my tape
> recorder was in my briefcase.  There wasn't even a tape in
> it.  He asked me - - I had my pencil in my hand with my
> pen and paper just to take notes and he asked me just to
> quit writing, to put my paper and pen down and he told
> me what happened.  And by all means, I obliged and I
> placed everything down and shoved it off to the side.  I
> wanted to hear what Mr. Sanders ha[d] . . . to say.

Mr. Sanders tells me when he's kicked out of his house by his sisters, he was again under [the influence of] cocaine and drinking.  He said he was walking down the street. He would have robbed anybody he came across.  He admitted kicking in the door, leaving the sister's house that night with a gun.  But he didn't want to talk about the gun.  He didn't want to tell me where he got it or what happened to it afterwards.  And I didn't want to push the issues, just continue talking.

When he kicked the door in, he confronted the - - Mr. and Mrs. Valdez in their bedroom.  He told Mr. Valdez he was going to tie him up.  He put the gun on the bed.  He said at that time Mr. Valdez attac[k]ed him.  They started fighting.  He said they f[o]ught even all the way out into the hallway.  And he said even the lady was helping him. He said he finally broke loose from them and was able to run back into the bedroom and grab the gun.

Again Mr. Valdez attac[k]ed him again at which time during the struggle he said he was actually on top of Mr. Valdez and stuck the gun to his head and said, ["]I can kill you, man.  I can kill you.["]  He said some[time] during that struggle is when the  gun when off.  I asked him did he remember the lady on the phone talking to the police and he said he remembered she was on the phone but he was just too busy looking for money.  He didn't know who she was talking with at which time he just wanted to get money and get out of there.

In addition to Defendant's confession, his fingerprints were also identified on the clock radio from the Valdez' bedroom.  At trial, the court certified Charles H. Fauville, Senior Crime Laboratory Analyst, Florida Department of Law Enforcement (FDLE), to be an expert in the field of fingerprint analysis and forensic examiner.  Mr. Fauville testified that on June 19, 1997, he was present in court, and he had rolled a set of Defendant's fingerprints on a fingerprint card, and the prints were called "known standards" or "inked recordings," since he knew whose prints they were.  Mr. Fauville stated that he had rolled the known fingerprints even though a bailiff had previously signed the card that read, "Fingerprints taken by _____ and title _____ ."  The card with Terrol Sanders'[s]  prints were introduced into evidence over the defense's objection as State's Exhibit #44.  Mr. Fauville testified that

latent prints were hidden prints or also called "a chance impression." They may be visible or invisible.

[The prosecutor] showed Mr. Fauville State's Exhibit #43(a) and #43(b), which had been lifted from the victims' clock radio. Mr. Fauville testified that he compared the latent prints to the known prints and he stated, "It is my opinion that State's Exhibit Number 43(a), photograph containing a latent print, was made by the same fingerprint on this inked fingerprint card, State's Exhibit Number 44, bearing the name Terrol Sanders . . . . That would be the left ring finger." Mr. Fauville also testified, "The latent fingerprint on State's Exhibit Number 43(b) was identified with the same inked fingerprint, the left middle finger on this inked fingerprint card bearing the name Terrol Sanders." Mr. Fauville testified that his identification of the two fingerprints belonged to Terrol Sanders "to the exclusion of every other human being on the face of the earth."

The court finds that even though Defendant alleges that Mr. Hooper provided ineffective assistance of counsel because Defendant unequivocally told Mr. Hooper not to concede his guilt at any point in the proceedings thus relieving the State of its burden to place defendant at the crime scene and prove that he fired the shots that killed one victim and wounded another, the State presented Det[ective] Childers, who testified that Defendant confessed to him, and the State also presented a fingerprint expert who identified two of Defendant's fingerprints, left middle finger and left ring finger, on the victims' clock radio which was located in their bedroom "to the exclusion of every other human being on the face of the earth."

For these reasons, the court finds that Mr. Hooper's representation and concession of certain facts in his opening statement did not constitute a substantial and serious deficiency measurably below that of competent counsel, nor did it prejudice Defendant to the extent that there is a likelihood that the deficient conduct affected the outcome of the proceedings; therefore, this ground is denied.

In his reply Sanders argues that, under *United States v. Cronic,* 466 U.S. 648

(1984), and *Florida v. Nixon*, 543 U.S. 175 (2004), Hooper "entirely failed to subject the

prosecution's case to meaningful adversarial testing" and that *Cronic's* presumption of

prejudice applies to resolve his ineffective assistance of counsel claim because Hooper

failed to obtain Sanders's consent to pursue a strategy of conceding some critical facts. Sanders further contends that the challenged comments "were the functional equivalent of a guilty plea" (Doc. 1, p. 32) requiring analysis under *Cronic's* presumption of prejudice standard rather than under *Strickland*.

*Cronic*, 466 U.S. at 659, holds that *Strickland's* prejudice requirement is inapplicable if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."  If counsel so fails, a reviewing court presumes prejudice and vacates the defendant's conviction.  In *Nixon*, the Court emphasized the narrowness of *Cronic*, holding that *Cronic* is inapplicable "when defense counsel strategically concedes guilt in a capital case in order to more credibly advance [the] defendant's case for leniency in the penalty phase."  *Darden v. United States*, ___ F.3d ___, 2013 WL 500726 (11th Cir. Feb. 12, 2013).

Sanders's claim rests upon the mistaken premise that Hooper conceded Sanders's guilt to the charged offenses.[15]  Hooper advised the jury of some incriminating facts that he knew the jury would hear through admissible evidence, including both Sanders's confession to Detective Childers and the surviving victim's testimony.  Based on those facts and the evidence against Sanders (including Sanders's fingerprints on the alarm clock inside the Valdez home), counsel strategically chose to

---

[15]  Although Sanders in his federal petition fails to specify to which of the charged offenses counsel allegedly conceded Sanders's guilt, he states in his reply (Doc. 25, p. 17) (emphasis added) that he "instructed [Hooper] numerous times to never concede his guilt in any way at any of the proceedings [or to] reliev[e] the State of its burden to prove beyond a reasonable doubt [Sanders's] participation in *any crime*."

use his opening statement to advise the jury of some incriminating facts in an attempt to establish credibility with the jury in hopes of avoiding a conviction on the charged offenses, particularly the first-degree capital murder charge, which could result in the death penalty.  Hooper's admission of those incriminating facts is not equivalent to conceding Sanders's guilt, as occurred in *Cronic* and *Nixon*.  *Strickland*, not *Cronic*[16] or *Nixon*,[17] controls Sanders's ground of ineffective assistance of counsel.

---

[16] Sanders's argument that Hooper's statements are the functional equivalent of a guilty plea lacks merit.  Despite the opening statement, the prosecutor was required to present competent, admissible evidence establishing the essential elements of the charged offenses.  Menadier cross-examined the prosecution's witnesses, presented witnesses on Sanders's behalf, objected to the admissibility of testimony and evidence, moved for a judgment of acquittal, and gave a cogent defense theory in her closing argument.  Contrary to Sanders's assertion, Menadier exposed the prosecution's case to meaningful adversarial testing.  Consequently, *Cronic's* presumption of prejudice is inapplicable.  *See Bell v. Cone*, 535 U.S. 685, 697 (2002) (emphasizing that *Cronic's* presumption of prejudice applies only when counsel "entirely fails" to meaningfully test the prosecution's case).

[17] Even assuming (1) that *Nixon* applies, (2) that Hooper's statements amount to a concession of guilt, and (3) that Sanders did not consent to Hooper's strategy, Sanders cannot obtain relief.  Hooper was not precluded from pursuing his strategy of admitting some incriminating facts despite Sanders's disagreement with that strategy.

> An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy.  *Strickland*, 466 U.S. at 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674.  That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision."  *Taylor v. Illinois*, 484 U.S. 400, 417-418, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval).  But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate.  A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal."  *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n.1, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (Burger, C. J., concurring).  Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

(continued...)

Under *Strickland*, Sanders bears the burden of proving that counsel's strategy was objectively unreasonable. *Van Poyck*, 290 F.3d at 1322. The evidence against Sanders, including his confession and his fingerprints at the crime scene, justified counsel admitting some incriminating facts to try to negate the premeditation element of both the first-degree murder and attempted first-degree murder charges and the intent element of the remaining charges. *See McNeal v. Wainwright*, 722 F.2d 674, 677 (11th Cir. 1984) ("In light of the overwhelming evidence against him [including a tape-recorded confession], it cannot be said that the defense strategy of suggesting manslaughter instead of first-degree murder was so beyond reason as to suggest defendant was deprived of constitutionally effective counsel."). Sanders fails to show that a reasonable probability exists of a different outcome at trial if Hooper had not argued as he did on Sanders's behalf in the opening statement. *Nixon*, 543 U.S. at 192 ("[C]ounsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade.") (citation omitted). Consequently, Sanders fails to meet his burden of proving that the state court either unreasonably applied *Strickland* or unreasonably determined the facts in rejecting this ground.

---

[17](...continued)

*Nixon*, 543 U.S. at 187. The Court has not extended *Nixon* to require counsel to consult with a defendant before conceding guilt on a lesser-included offense. *See Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1250 (11th Cir. 2011) ("Nixon's explicit consent to counsel's concession strategy was not required.") (citing *Nixon*, 543 U.S. at 189).

**Ground Six**

Charles Fauville, a senior crime laboratory analyst, compared Sanders's fingerprints with latent fingerprints recovered from a plastic alarm clock at the crime scene. Fauville testified in a pre-trial deposition that he did not count the points of comparison between the two sets of prints.[18]  (Doc. 1, Ex. B5)  Fauville testified at trial as an expert witness for the prosecution that two of the latent fingerprints belonged to

---

[18]  Fauville testified:

> Q:     Okay.  [Exhibits] 2-1 and 3, how many points of comparison were you able to make?
>
> A:     I never counted them.
>
> . . . .
>
> Q:     Well, how did you determine that this left ringer finger matched the left ring finger in the prints that you took from Terrol Sanders?
>
> A:     You begin the comparison and you're looking at the unique individual characteristics that are present in the latent print.  And when those occupy the same relative position both in the latent and in the inked print, it is at that point that an identification is effected.  The fewest number I have ever testified on is eight.  I believe there were a substantial [bit] more there.  No less than twelve in this one.
>
> . . . .
>
> A:     I can see ten right now without using the magnifying glass.
>
> Q:     Okay.  Ten points that matched the prints that you took from him?
>
> A:     Yes.
>
> Q:     Okay.  Can you give me an example because it just looks like a lot of ink to me?
>
> A:     I could not give an example.

Sanders "to the exclusion of every other human being on the face of the earth."

(Respondent's Exhibit B, Vol. VIII, pp. 1071-72)

Before Menadier cross-examined Fauville at the trial, the trial judge inquired of

Sanders whether he wished to ask Fauville any questions.[19]  Sanders declined to ask

cross-examine Fauville himself.  Menadier elicited on cross-examination that Fauville

did not collect the latent fingerprints from the clock at the crime scene and that his

signature did not appear on Sanders's inked fingerprint card despite Fauville having

actually rolled those fingerprints himself.  (Respondent's Exhibit B, Vol. VIII, pp.

_____

[19]  After granting Sanders's motion to discharge Hooper, the trial judge advised Sanders that he
would permit Sanders to question each witness in addition to Menadier's examination.  The trial
judge specifically inquired of Sanders if he wished to question Fauville (Respondent's Exhibit B, Vol.
VIII, pp. 1074-75):

>     Court:  Let the record reflect that the jury's been removed from the
>             courtroom.  The defendant remains represented by counsel and the
>             State is represented.
>
>             Mr. Sanders, [counsel] asked if she could approach the bench a few
>             moments ago before I had the jury removed and she advised me that
>             she had discussed with you whether or not you wish to ask a question
>             to any of these witnesses and she advised me that you did not want to
>             ask questions to the witnesses.
>
>             I was going to give you a chance to question any witness that you
>             wanted to.  And she requested that I not do that in the presence of the
>             jury because it would further highlight the fact that you aren't asking
>             any questions.  Now, I want to make sure that this is what you want
>             to do.  That's why I asked this jury to be removed so it wouldn't be
>             contaminated in any form or manner.  Do you wish to ask [Fauville]
>             any questions?
>
> [Sanders]:  No, sir, Your Honor, but I would like to keep the
>             options open to ask questions if I could at a later time.
>             But I would agree with [counsel] and ask that you not
>             keep asking me every time if I want to.

1077-78)  Menadier did not ask Fauville about the number of points of comparison between the latent fingerprints and Sanders's fingerprints.

Sanders contends that Menadier rendered ineffective assistance by not cross-examining Fauville about the points of comparison.  He argues that the prosecutor neither asked Fauville to tell the jury the number of points of comparison he found between Sanders's known fingerprints and the latent fingerprints nor established beyond a reasonable doubt that the latent fingerprints belonged to Sanders.  He further argues that Menadier "was grossly ineffective in her cross-examination of Mr. Fauville regarding his lack of finding any points of comparison," and "never found out . . . if there were any points of dissimilarity between the known, inked prints of Sanders and the latent prints recovered from the scene."  (Doc. 1, p. 39)

The state post-conviction court summarily rejected this ground (Respondent's Exhibit F, pp. 5-6) (court's record citation omitted):

> Defendant alleges ineffective assistance of counsel for failing to cross-examine the fingerprint expert regarding the points of comparison relating to the known fingerprints of Defendant and those recovered from the scene.  Defendant contends that counsel was grossly ineffective in her cross-examination of Mr. Fauville where nowhere in the record does it show that counsel questioned Mr. Fauville regarding his lack of finding of any points of comparison.  Defendant claims that he could have used the deposition of Mr. Fauville to 1) show th[e] jury that the expert was not to be believed because he could not substantiate his claims regarding the fingerprints, or 2) impeach Mr. Fauville should he have attempted to change his prior testimony.
>
> If the jury had ample information from which to assess the witness's credibility and weigh his testimony accordingly, counsel's decision not to use the deposition material to impeach the witness does not affect the

outcome of the proceedings.  *See Chandler v. State* 702 So. 2d 186 (Fla. 1997); *Brown v. State*, 439 So. 2d 872 (Fla. 1983).

The record clearly reflects that defense counsel adequately cross-examined the witness.  The fact that the jury was not ultimately persuaded by counsel's strategy does not mean that representation was inadequate.  *See Songer v. State*, 419 So. 2d 1044 (Fla. 1982).  As such, no relief is warranted on this ground.

"The inquiry into whether a lawyer has provided effective assistance is an objective one:  a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take."  *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002).  A habeas petitioner must overcome a presumption that the challenged conduct of one's counsel was a matter of strategy.  *Strickland,* 466 U.S. at 689; *United States v. Perry*, 908 F.2d 56,59 (6th Cir. 1990).  Counsel's decision to cross-examine and the manner of the cross-examination are strategic decisions entitled to deference.  *Dorsey v. Chapman*, 262 F.3d 1181 (11th Cir. 2001), *cert. denied*, 535 U.S. 1000 (2002); *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001).  The only question is whether counsel's strategic decision was "reasonable."  *See Minton v. Sec'y, Dep't of Corr.*, 271 Fed. Appx. 916, 918 (11th Cir. 2008) ("The Supreme Court has 'declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)); *Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision . . . appears to have been unwise in retrospect, the

decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'").  A defendant's disagreements with counsel's tactics or strategies will not support a claim of ineffective assistance of counsel.

Although Menadier only briefly cross-examined Fauville, she highlighted for the jury that Fauville neither collected the latent fingerprints from the clock nor signed the inked fingerprint card attesting that those fingerprints, in fact, belonged to Sanders.[20] Sanders fails to show that Menadier's decision to limit her cross-examination was anything other than trial strategy.  *Strickland*, 466 U.S. at 689; *Perry*, 908 F.2d at 59. Sanders also fails to show that cross-examining Fauville about the points of comparison would have altered the outcome of his trial.  Consequently, he fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this ground.

**Ground Eight**

Sanders contends that the cumulative effect of trial counsels' errors presented in grounds five through seven[21] of his federal petition resulted in a denial of his right to

---

[20]  Although this ground was not a subject of the Rule 3.850 evidentiary hearing, Menadier testified at the hearing that co-counsel had retained his own fingerprint expert who confirmed that the latent fingerprints on the clock belonged to Sanders.  (Respondent's Exhibit J, pp. 42-43)  Consequently, cross-examination about the points of comparison would not have aided Sanders's defense.

[21]  In addition to the claims of ineffective assistance of counsel presented in grounds five through seven of the federal petition, Sanders asserts additional bases of ineffective assistance of trial counsel
(continued...)

the effective assistance of counsel.  The state post-conviction court summarily rejected this ground without elaboration.  (Respondent's Exhibit K, p. 25)

"Without harmful errors, there can be no cumulative effect compelling reversal." *United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984), *cert. denied*, 469 U.S. 1158 (1985).  *See also Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004) ("[T]he court must consider the cumulative effect of [the alleged errors] and determine whether, viewing the trial as a whole, [petitioner] received a fair trial as is [his] due under our Constitution.").  Because each of Sanders's grounds of ineffective assistance of trial counsel lacks merit, no cumulative prejudicial effect results.  *See Spears v. Mullin*, 343 F.3d 1215, 1251 (10th Cir. 2003) ("Because the sum of various zeroes remains zero, the claimed prejudicial effect of [counsel's] cumulative errors does not warrant habeas relief."); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).  Sanders fails to meet his burden of proving that the state court either unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting  this ground.

---

[21](...continued)
(not preserving for appeal a claim of juror misconduct, not moving for the trial judge to recuse himself,) to support his cumulative error claim.  Sanders did not present the additional claims as independent substantive grounds for relief in the federal petition.  Consequently, those grounds cannot support a cumulative error claim based on counsels' alleged ineffectiveness because Sanders establishes neither deficient performance nor resulting prejudice.  *Strickland*, 466 U.S. at 691-92.

**Ground Three**

Sanders contends that his appellate counsel rendered ineffective assistance by not arguing on appeal that the trial court improperly denied his motion to suppress evidence.  The state district court of appeal rejected this ground in Sanders's state habeas petition.

The *Strickland* standard of review applies to ineffective assistance of appellate counsel claims.  *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077 (1992).  To establish a claim of ineffective assistance of appellate counsel, Sanders must show that appellate counsel performed deficiently and that the deficient performance resulted in prejudice.  To demonstrate deficient performance, Sanders must show that appellate counsel's failure to discover a non-frivolous issue and file a merits brief raising that issue fell outside the range of professionally acceptable performance.  *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).  To demonstrate prejudice, Sanders must show that a reasonable probability exists that, but for appellate counsel's unreasonable failure to file a merits brief, he would have prevailed on appeal.  528 U.S. at 285-86.

While Sanders's ineffective assistance ground is of federal constitutional dimension, his underlying claim challenging the application of state procedural rules to reject his motion to suppress is a matter of state law.  The state district court of appeal by rejecting this ground has answered the question of what would have happened if counsel had challenged on direct appeal the denial of the motion to suppress.  *See*

*Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005) ("The Florida Supreme Court already has told us how the issues would have been resolved under state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . . It is a "fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'"); *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("[T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [petitioner's counsel] objected to the introduction of [petitioner's] statements based on [state law] – the objection would have been overruled . . . . Therefore, [petitioner's counsel] was not ineffective for failing to make that objection."). Sanders shows neither deficient performance nor resulting prejudice from appellate counsel's failure to challenge the denial of the motion to suppress. Consequently, this ground warrants no relief because Sanders fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this ground.

Accordingly, Sanders's petition for the writ of habeas corpus (Doc. 1) is **DENIED**. The clerk shall enter a judgment against Sanders and close this case.

## DENIAL OF BOTH A
## CERTIFICATE OF APPEALABILITY
## <u>AND LEAVE TO APPEAL *IN FORMA PAUPERIS*</u>

Sanders is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's

denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a

COA.  Section 2253(c)(2) permits issuing a COA "only if the applicant has made a

substantial showing of the denial of a constitutional right."  To merit a COA, Sanders

must show that reasonable jurists would find debatable both (1) the merits of the

underlying claims and (2) the procedural issues he seeks to raise.  *See* 28 U.S.C.

§ 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d

926, 935 (11th Cir 2001).

Because he fails to show that reasonable jurists would debate either the merits of

the claims or the procedural issues, Sanders cannot meet *Slack's* prejudice requirement.

529 U.S. at 484.  Finally, Sanders is not entitled to appeal *in forma pauperis* because he

is not entitled to a COA.

Accordingly, a certificate of appealability is **DENIED**.  Leave to proceed *in*

*forma pauperis* on appeal is **DENIED**.  Sanders must pay the full $455 appellate filing

fee without installments unless the circuit court allows Sanders to proceed *in forma*

*pauperis*.

ORDERED in Tampa, Florida, on March 27, 2013.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE